## McCRACKEN v. THE CITY OF SAN FRANCISCO.

THE Charter of 1851 of the city of San Francisco vested the legislative power of the city in a Common Council, consisting of a Board of Aldermen and a Board of Assistant Aldermen, each composed of eight members, and provided that no ordinance or resolution should be passed unless by a majority of all the members elected to each Board. On the fifth of December, 1853, the Mayor of the city approved of what purported to be an ordinance passed by the Common Council, providing for the sale of certain slip property of the city. This ordinance is designated in the official book of city ordinances as Ordinance No. 481. At the time the ordinance was presented to the Board of Assistant Aldermen, there was a vacancy in the Board, occasioned by resignation, of one of its members, so that there were but seven members in office. Of these seven, four members voted for the ordinance, and three against it: *Held*, that the ordinance not having received a majority of the entire Board—of the constituent number—was never passed, but was in fact rejected.

The alleged Ordinance No. 481 authorized and required the Mayor and Joint Committee on land claims of the city to sell the property specified at public auction, to the highest bidder, at such time and place as they might think advisable, after not less than ten days' advertisement. The sale was advertised for December 26th, 1853. Within one hour previous to the sale, the Common Council passed an ordinance, designated in the official book as Ordinance No. 493, appropriating certain proceeds of the intended sale: *Held*, that this recognition of the existence of Ordinance No. 481, and the appropriation of a portion of the proceeds of the sale, did not constitute an adoption and approval of what had been previously done, or might be subsequently done according to the terms of that ordinance, so as to give validity to the sale which took place.

The only authority the Common Council possessed to sell city property was derived from the thirteenth section of article three of the charter, and this section provides for the sale of property in one way only, to wit: by the passage of *laws*, which term is synonymous with ordinances, when applied to acts of municipal corporations. This mode of selling the property having been pointed out by the charter, was restrictive—no other mode could be followed.

The only way in which the Common Council could give validity to a sale, was by passing a law directing it. Ordinance No. 493 does not purport to provide for any sale, but simply assumes that an ordinance ordering a sale had already passed; but this assumption could impart no vitality to the alleged Ordinance No. 481. The Common Council could pass a law or ordinance only in one way, and that was by voting for it.

The land directed by the terms of Ordinance No. 481 to be sold, was set apart and dedicated as a public dock by an ordinance passed in 1852, and while this dedicating ordinance remained in force, no sale could be legally had. In dedicating the land to public use, the Common Council exercised powers purely of a governmental nature, and not those of a mere property holder. It was by

McCracken *v.* City of San Francisco.

legislation that the dedication was made, and only by legislation could the public franchise be destroyed.

The distinction taken between the powers of a municipal corporation, when acting in its political and governmental character, and when acting with reference to its private property, has no application to the questions involved in the case at bar. Its powers, whether regarded as political or governmental, or those of a mere private corporation, could be exercised only in conformity with the provisions of the charter. The Legislature could impose such restrictions as it thought proper, and it saw fit to require the formalities of legislation for the disposition of the city property, as it did for the imposition of taxes, the regulation of the fire department, and matters connected with the general welfare of the city.

*Holland* v. *The City of San Francisco* (7 Cal. 361) distinguishable from this case in this: that there, the fact that the property had been previously dedicated to public use as a public dock was not presented; but that case is not law, and is overruled, so far as it holds that Ordinance No. 493 recognized and adopted Ordinance No. 481, so as to render the subsequent sale valid and binding upon all parties.

Admitting that Ordinance No. 493 did adopt and pass No. 481, it did so only within one hour previous to the sale. But this ordinance directs the sale upon ten days' previous advertisement. The authority to sell upon ten days' notice was not therefore pursued, and the sale without such notice was void.

A ratification is equivalent to a previous authority. It operates upon the act ratified in the same manner as though the authority had been originally given; and where the authority can originally be conferred only in a particular form or mode, the ratification must follow the same form or mode.

Where an authority to do any particular act on the part of a corporation can only be conferred by ordinance, a ratification of such act can only be by ordinance.

A ratification can only be made when the principal possesses at the time the power to do the act ratified. He must be able, at the time, to make the contract to which, by his ratification, he gives validity. The ratification is the first proceeding by which he becomes a party to the transaction, and he cannot acquire or confer the rights resulting from that transaction unless in a position to enter directly upon a similar transaction himself.

Ordinance No. 505 of the city of San Francisco, passed January 10th, 1854, by which the Mayor and Land Committee were authorized to pay out of moneys in their hands, arising from the sale ordered by Ordinance No. 481, the salaries of the members and officers of the police for the months of November and December of the previous year, does not ratify Ordinance No. 481 because appropriating the proceeds of the sale. It assumes that Ordinance No. 481 was valid, and there is nothing in the appropriation from which an intention to ratify can be implied. If the intention to ratify under some circumstances could be thus implied, the implication would be of no avail in the present case, as the Common Council were at the time laboring under the mistaken impression that Ordinance No. 481 had become law. Ratification, to be effective, must be made with full knowledge of all the facts relating to the act ratified. To entitle any proceedings of the Common Council to the slightest consider-

McCracken *v.* City of San Francisco.

ation as evidence of ratification, it must be shown that those proceedings were taken with full knowledge that the ordinance had never passed, and that the sale thereunder was an absolute nullity.

Inasmuch as by article six, section six, of the Charter of San Francisco of 1851, the Common Council could authorize a sale of city property at public auction only, ratification of a previous sale is impossible. The object of the ratification is to vest in the previous purchaser the title; but at public auction there would be no certainty of this, for at the auction every one would be at liberty to bid, and the property would fall to the highest bidder.

The city of San Francisco is not estopped from denying the sale made under Ordinance No. 481, and asserting title to the property sold. The matters relied upon by way of estoppel, with the exception of Ordinance No. 493, occurred after the sale, and could not have influenced the plaintiff in his purchase. Ordinance No. 493, directing an appropriation of a portion of the anticipated proceeds, was passed within one hour of the sale, and it nowhere appears that the same was ever brought to the notice of the plaintiff. Nor does it appear that there was any fraud or intention to deceive on the part of the Common Council. They acted, in passing Ordinance No. 493, and in the subsequent use of the proceeds, upon the impression that a valid ordinance authorizing the sale had been passed.

The doctrine of estoppel, as laid down in *Biddle Boggs* v. *Merced Mining Co.,* (14 Cal. 280) controls the question here.

Even if the city would be estopped from denying the sale, and from asserting title to the property sold, it does not follow that the plaintiff would be estopped from claiming a return of the money he paid. The doctrine of estoppel *in pais* is applied to prevent a wrong-doer from asserting claims against his declarations or conduct, not to prevent an innocent party from enforcing his rights. It is the wrong-doer who is estopped, upon the principle that he shall not take advantage of his own wrong.

The sale of the city's property in this case being without authority and void, the plaintiff is not required to surrender possession of the property before he can maintain an action to recover back the purchase money.—FIELD, C. J.

The title of the city was unaffected by the sale, and the deeds made in pursuance thereof. The parties claiming possession from the plaintiff are simple trespassers, who can, at any time, be ejected from the premises by action on behalf of the city. *Id.*

The cases where possession must be surrendered, before action for the purchase money can be brought, are those where a contract has been made, and possession has been taken thereunder, and the vendee seeks to rescind the contract on the ground of defective title, or the inability of the vendor to perform the contract on his part, or of some fraudulent representations inducing its execution. In these cases the vendee must first offer to restore whatever he has received, before he can call upon the vendor to refund the purchase money. Where the contract is void, there is nothing to rescind; no rights are acquired, and there are, in consequence, no rights to restore. *Id.*

The fifth section of article three of the Charter of 1851 of the city of San Francisco, as to the city's not incurring debts beyond $50,000 under certain circum-

McCracken *v.* City of San Francisco.

stances, is directory, and is not a limitation of the power of the Common Council as to the amount of debts and liabilities to be incurred.

This section of the charter refers only to the acts or contracts of the city, and not to liabilities which the law may cast upon her. It was intended to restrain extravagant expenditures of the public moneys, not to justify the detention of the property of her citizens which she may have unlawfully obtained; and where, as in this case, plaintiff claims that the city has got his money without consideration—by mistake—and has appropriated it to municipal purposes, she is bound to refund; because the law—not her contract or permission—renders her liable. Her liability in this respect is independent of the restraining clauses of the charter; it arises from the obligation to do justice—to restore what belongs to others—which rests upon all persons, whether natural or artificial.

The restriction contained in the fifth section of the charter can, in any view, only apply to liabilities dependent for their creation upon the volition of the Common Council, and hence does not include liabilities arising from torts, or trespasses, or mistakes.

The sale of December 26th, 1853, under Ordinance No. 481, being void, no title passed to the purchasers at that sale. The title to the property still exists in the city, except where deeds have since been taken under the Acts of 1858 or 1860. The property remaining can at any time be taken possession or be disposed of by the city in the same manner as any other property belonging to her, except where her right to assert her title has been barred by the Statute of Limitations; and that statute does not run in favor of parties who affirm that the title never passed from the city, and sue for the recovery of the purchase money.

The Statute of Limitations runs only in favor of parties in possession claiming title adversely to the whole world, and not in favor of those who assert the title to be in others. It therefore never run in favor of the plaintiff, and the grantees of the plaintiff are in no better position. Their possession cannot be tacked on to that of the grantors, so as to render adverse the possession for the entire period subsequent to the sale.—Field, C. J.

To render possession adverse, so as to set the Statute of Limitations in motion, it must be accompanied with a claim of title, and this claim, when founded "upon a written instrument as being a conveyance of the premises," must be asserted by the occupant in good faith, in the belief that he has good right to the premises, and with the intention to hold them against all the world. The claim must be absolute—not dependent upon any contingencies—and must be "exclusive of any other right;" and to render the adverse possession thus commenced effectual as a bar to a recovery by the true owner, the possession must be continued without interruption, under such claim, for five years. When parties assert, either by declarations or conduct, the title to property to be in others, the statute cannot, of course, run in their favor. Their possession under such circumstances is not adverse.

The deed to plaintiff of the land bought being signed by the Mayor of the city and sealed with the corporate seal—the Mayor being the legal custodian of the seal, and it being affixed by his authority—is sufficient to entitle the deed to

be read in evidence, and a party relying upon it need not go behind the seal for the purpose of showing authority for its execution. The seal is *prima facie* evidence that it was affixed by proper authority, and the deed is *prima facie* sufficient to pass the title.—COPE, J.

The deed in this case is not a mere nullity. So far as passing title to the land, or creating any right or interest against the city is concerned, the deed is inoperative and void, and may be attacked collaterally. But the objections to it do not appear on its face,. and its invalidity must be shown by the party impeaching it, by evidence *aliunde. Id.*

*Prima facie*, it is a valid and sufficient conveyance, and a party holding under it must be deemed to hold adversely, and not in subordination to the real title. Possession under it may ripen into a perfect title, and it cannot fail to prejudice the interests, if not the rights, of the lawful owner. *Id.*

Such being the effect of the deed in this case, plaintiff cannot recover the purchase money without procuring a reconveyance of the property and a surrender of the possession, so as to place the parties in *statu quo. Id.*

APPEAL from the Twelfth District.

On the trial, which was before the Court, by consent of parties, plaintiff introduced in evidence section eight of an ordinance of the city of San Francisco, passed November 4th, 1852, and also Ordinance No. 493, both of which appear in the opinion of the Court.

It was admitted that the land described in said section eight is the same land which is ordered to be sold by Ordinance No. 481, which was also introduced in evidence, and is as follows:

" *Ordinance* 481—To provide for the sale of certain city property.

" The people of the city of San Francisco do ordain as follows:

" SECTION 1. That the Mayor and Joint Committee on land claims of the city of San Francisco are hereby authorized and required to sell at public auction (after not less than ten days' advertisement) in three of the daily papers, to the highest bidder, at such time and place as they may think advisable, all those pieces or parcels of land and water situated in the city of San Francisco, and described as follows: First piece or parcel—Bounded on the north by Clay street, on the south by Central wharf, on the east by the west line of Drumm street, and on the west by Davis street. Second piece or parcel—Bounded on the north by Central wharf, on the south by Sacramento street, on the east by the west side of Drumm street, and on the west by Davis street. Third piece or parcel—Bounded on the north by Clay street, on the south by Central wharf, on the east by the west line of East street, and on the west by the east line of Drumm street. Fourth

piece or parcel—Bounded on the north by Central wharf, on the south by Sacramento street, on the west by the east line of Drumm street, and on the east by the west line of East street—which last and west line of East street shall be continued westwardly and northerly in its present direction, to its junction with the south line of Clay street.

" Sec. 2.    Said pieces or parcels of land and water as herein specified, shall be resurveyed, under the supervision, and as the Mayor and Joint Committee on land claims may direct.

" Sec. 3.    Twenty-five per cent. of the net proceeds of said sale shall be paid on the day of sale in cash, or State indebtedness receivable for public dues by the State, which amount shall be paid to the State of California pursuant to the Act of the Legislature, approved twenty-sixth March, one thousand eight hundred and fifty-one.    Fifty per cent. to be paid in sixty days thereafter in cash, or city warrants that may have been issued on or after May first, one thousand eight hundred and fifty-one ; and the balance of twenty-five per cent. payable in four months from date of sale in cash, or three per cent. city scrip issued prior to May first, one thousand eight hundred and fifty-one, and which may not have been funded as provided by an act of the Legislature of this State, entitled : 'An Act to authorize the Funding of the Floating Debt of San Francieco, and to provide for the payment of the same.'

" Sec. 4.    The Mayor shall execute, on behalf of the city, a bond to each purchaser at the time of first payment, that when the whole of the purchase money is paid, the city shall give to the purchaser a deed of the lot or lots purchased ; and on payment of the last installment, then the Mayor shall execute a deed to the party lawfully entitled to same under sale.

" Sec. 5.    That the eighth section, title four, chapter four of an ordinance to revise, codify and amend the general ordinances of the city of San Francisco, approved November fourth, one thousand eight hundred and fifty-two, and all other ordinances, or parts of ordinances conflicting with this ordinance be, and the same are, hereby repealed.

(Signed)                        " Frank Turk,
                    " President of Board of Assistant Aldermen.
                                " Joseph F. Atwill,
                    " President of Board of Aldermen.

"Approved December 5th, 1853.
                            " C. K. Garrison, Mayor."

McCracken *v.* City of San Francisco.

At the time of the presentation, and at the time of the passage of the aforesaid ordinance, the Board of Assistant Aldermen was composed of seven members, one member having resigned, and his place not having yet been filled ; and the said ordinance' received in the Board of Assistant Aldermen four votes only in its favor to three votes against it. In the Board of Aldermen it received the requisite number of votes, and was signed by the Mayor on the fifth day of December, 1853.

The companies and William E. Dennis, named in Ordinance No. 493, (which is given in the opinion) claimed that they would be damaged by the filling of the slip, and the sums mentioned in that ordinance were awarded to them in satisfaction of their claims for damages.

The Ordinance No. 493 was signed by the Mayor about half an hour before the sale hereinafter mentioned, and on the twenty-sixth day of December, and after the said ordinance had been signed, the Mayor and Joint Committee on land claims—which committee consisted, besides the Mayor, of two members from each Board of the Common Council, and was a standing committee of the Common Council—proceeded to sell at public auction the land mentioned and described in said ordinance No. 481.

Said sale purported to be a sale by the city of San Francisco of the property mentioned in Ordinance No. 481, and was advertised for ten consecutive days preceding the same, in more than three daily newspapers printed and published in the city of San Francisco. At said sale there were present the Mayor, the Committee on land claims, and nearly all the members of both Boards of the Common Council. No person protested against, or objected to the sale, which was conducted in accordance with the directions of Ordinance No. 481. The prices were favorable to the city, and the property, since that time, has decreased in value, and at time of suit brought was not worth more than one-half the price obtained at the sale.

At the sale the plaintiff bid off lot numbered one hundred and ten, for the sum of $8,400—and paid at the time, on account, the sum of $2,100, either in cash or State warrants, to Selover & Sinton, the auctioneers who conducted the sale, which was afterwards, on the twenty-seventh day of December, 1853, paid by them to the Secretary of the Joint Committee on land claims. The difference between the value of State warrants and cash at the time of payment was from one to one and one-half per cent.

On the twenty-seventh day of December, 1853, a bond was signed, sealed and delivered to the plaintiff and accepted by him—said bond being sealed with the seal of the city, and authenticated by the signature of the Mayor, which seal was so affixed by the authority and direction of the Mayor, and the bond was conditioned for the conveyance of the lot in question by the city on payment of the purchase money.

Smyth Clark, to whom said payment was made, was Mayor's clerk, and, before the said payment was made to him, was appointed by the Mayor and Joint Committee on land claims their secretary, and authorized by them to collect the money paid on account of city slip sale. On the twenty-first day of April, 1854, as Secretary of Land Committee, he made a report to the Common Council of moneys received from the sale of city property. Said report was in the name of the Land Committee—Smyth Clark being the author thereof—and was a report of money received by Selover & Sinton, auctioneers, and Smyth Clark, Secretary of the Land Committee, up to that time, and was accepted by the Common Council, after being referred to the Special Committee on land claims.

There was paid to the different city Treasurers from the proceeds of these sales, by the Land Committee, $630,426.05.

Prior to September 29th, 1854, the balance of the funds remaining in the hands of Smyth Clark, Secretary of the Land Committee, was attached in suits brought by one Argenti and others against the city of San Francisco, and on the twenty-ninth day of. September, 1854, the Common Council passed a joint resolution numbered four hundred and thirty-four, which is as follows:

"*Whereas,* The Land Committee of the Common Council received, under authority of said Council, a large amount of promissory notes, city Controller's warrants, State Controller's warrants, and other evidences of indebtedness, as the proceeds of the sales of the city slips; and *Whereas,* there remains in the hands of Smyth Clark, the Secretary of said committee, a considerable portion of said promissory notes and city and State warrants, which have been attached in the hands of said Smyth Clark, at the suit of one Argenti and others, claiming to be creditors of the city—so that the same are held by the said Clark to answer said attachment—therefore,

"*Resolved,* That the said Land Committee, and each and all of the members thereof, are hereby released and discharged from all further

responsibility touching the said notes and scrip so remaining in the hands of said Clark."

Said Clark continued to act as Secretary of the Land Committee and to have the collection of these funds, from early in the year 1854 to the end of the term of the Mayor and Common Council. No objection was ever made to his so acting, and the fact was well known to the Mayor and both Boards of the Common Council.

In sundry annual and monthly reports made by the Treasurer of the city of San Francisco, and accepted by the Common Council, payments were credited thus :

" Received from Smyth Clark, Secretary of the Land Committee, on account of sale of city slip property."

On the tenth day of January, 1854, the Common Council passed an ordinance, duly signed by the Mayor, directing the Joint Committee on land claims to pay the members and officers of the police for services rendered by them in the months of December and November, 1853, and for that purpose to use so much of the funds in their hands arising from the sale of property ordered sold by ordinance No. 481, as might be necessary ; and said payments were so made by the Land Committee, and receipts taken from the Treasurer.

By joint resolution, known as " Joint Resolution No. 383," passed January 9th, 1854, the Common Council authorized the same committee to pay a judgment recovered by one John E. Body, against the city, out of the same funds. The sums of money so directed to be paid to the police officers and Body, were so paid to them by the said Joint Committee.

April 7th, 1854, the Common Council passed a joint resolution, No. 400, directing, among other things, the Committee on land claims to make to the Common Council a full report of said sales, and of the moneys in their hands arising therefrom ; and the committee accordingly reported to the Common Council on the twenty-first of April, 1854, being the report hereinbefore referred to, of which Smyth Clark was the author.

On the tenth day of April, 1854, the Common Council passed joint resolution No. 405, in the words following:

" *Resolved*, That the city Treasurer be and he is hereby instructed to pay over to the State of California, out of the funds now in his hands, or which he may hereafter receive from the Committee on land claims, the portion of the receipts from the sale of city property sold by authority of Ordinance No. 481, which is due to the said State.

McCracken *v.* City of San Francisco.

"*Resolved,* That the city Treasurer be and he is hereby instructed to pay the outstanding warrants issued in settlement with the Clay, Central, Sacramento and California Street Wharf Companies out of the moneys remaining in his hands from the second payment on the sale of city property sold by authority of Ordinance No. 481, after the State's interest in the sale of said property shall have been liquidated."

On September 13th, 1854, the Common Council passed a joint resolution, designated No. 431, in which it was recited and declared that the city had sold property—being part of the property in question—to purchasers who had paid the greater part of the purchase money.

On March 26th, 1851, the Legislature of the State of California passed an act entitled "An Act to Provide for the Disposition of certain Property in the State of California," and on the fifth day of April, 1853, the Common Council of San Francisco passed an ordinance, duly approved by the Mayor, accepting the grant made by said act, and all the conditions thereof, and directing the payment of twenty-five per cent. of all proceeds arising from the sale of the property thereby granted—embracing the lots in question—to the State.

On March 16th, 1854, the plaintiff having paid the last installment of the purchase money, the Mayor of the city of San Francisco executed and delivered to him, and he accepted a deed, or what purported to be a deed, without warranty, of the premises so purchased by him at the aforesaid sale, which conveyance was sealed with the corporate seal of the city, affixed thereto by authority of the Mayor, and authenticated by his signature.

By ordinance duly passed and signed by the Mayor, on the fourth day of November, 1852, it was, among other things, provided that the Mayor of the city should have the charge and control of the seal of the city, and should therewith authenticate all acts of the city.

There have been paid to the joint committee on land claims, and also to the Treasurer of the city of San Francisco, by other purchasers at the sale of December 26th, 1853, large sums of money, and State and city Controller's warrants, including warrants issued under Ordinance No. 493, and of the moneys and warrants so paid to the Joint Committee, a large portion was paid by them to the Treasurer of the city.

Plaintiff entered into possession sometime in March, 1854, and is now in possession of said lot, and has expended thereon the sum of $3,000 in improvements.

About one week previous to the trial of this cause, the plaintiff

quitclaimed his interest in the lot to a person who had full knowledge of this suit, and all the circumstances.

At the time of the said payment made by the plaintiff on account of said sale, the city of San Francisco was indebted in the sum of $50,000 and upwards over the annual revenue of the city, excluding from such indebtedness the interest thereon existing on the fifteenth day of April, 1851.

Of the proceeds of said sales there were paid to the State $50,000 —in State indebtedness receivable for public dues by the State—by the Land Committee, being twenty-five per cent. of the proceeds of s sales, which had been paid at that time, and $60,000 of such indebtedness were attached in a suit against the city, in the hands of the Treasurer of the city.

The answer was a general denial. Defendant had judgment, and plaintiff appeals.

*Whitcomb, Pringle & Felton,* for Appellant.

### FIRST.

The sale, purporting to be a sale by the city of San Francisco, on the twenty-sixth day of December, 1853, was made without authority from the city, and the contract of sale to the plaintiff was therefore void.

I. The charter of the city of San Francisco, passed April 15th, 1851, provides that " no ordinance or resolution shall be passed unless by a majority of all the members elected to each Board."

At the April term of this Court, A. D. 1855, in the case of *The City of San Francisco* v. *Kelsey Hazen*, (5 Cal. 169) it was decided that the meaning of this provision was, that an ordinance to be valid must be passed by the assent of more than half of the number of members who had been elected to each Board, and that as eight was the number which had been elected to each Board, the concurrence of five members in the passage of an ordinance was essential.

The construction thus given to this provision has been universally acquiesced in since that time in the city of San Francisco, and the wisdom and policy of such a provision have been repeatedly recognized, not only by that city, but by the other municipal corporations of the State.

A striking proof of this is to be found in the legislation in regard to the city since the decision in the *Hazen* case. The Consolidation Act

39

of 1856 omitted this provision, and as soon as it was observed, the act was amended, (Statutes of 1857, 213, sec. 6, amending sec. 67 of the Consolidation Act) as follows: "A majority of all the Supervisors to be elected in the several districts shall constitute a quorum to do business, and no regulation, resolution, ordinance or order of the Board can pass without the concurrence of a majority of all the members elected; but a smaller number may adjourn from day to day." And for the past four years, the Supervisors have been acting under this provision, as thus construed by the Supreme Court.

Besides, the same principle has been incorporated into nearly all the charters of the principal cities of the State. (Act 1857, 80, 81, subdiv. 18, secs. 19, 23, 24, 29, 40, as to Placerville; Act 1859, 73, sec. 5, as to Stockton; Act 1860, 69, as to Oakland; Act 1860, 79, sec. 7, and Act 1857, 43, 45; also, art. 4, sec. 2, Acts 1857, 47; also, art. 5, sec. 5, Acts 1857, 51, as to Marysville; Act 1857, 134, 143, secs. 9–11, of art. 11; also, art. 4, subdiv. 4, sec. 1, and art. 6, sec. 2, as to Stockton.)

But if the true construction of this provision were an open question, it would still be decided in the same way. By an examination of sections two, three and eighteen of article three, and section two of article six of the Charter of 1851, it will be seen that the language "all the members elected to each Board," is used only in regard to the passage of laws regulating the entire city and the change of the charter. In the case of the expulsion of members, the language is simply "two-thirds of all the members," not of all the members elected to each Board.

The expression, "all the members elected to each Board," means all the members who have been elected; that is—eight. The language evidently means to adopt a rule different from the common law rule in regard to corporations. The common law rule is completely and entirely expressed in the first part of section three; "a majority in each Board shall be a quorum." If there were no other expression than this in the charter, then to pass an ordinance only three would be absolutely necessary, for the corporation would be in existence as long as there were five members left—these five would be a quorum, and three would be a majority. Now, the Legislature intended to change the rule of the common law; otherwise, one of these two sentences would be entirely redundant. In construing statutes, force and effect should be given to every part of them, and it cannot be supposed that the Legislature, in making this express provision to apply to ordinances

McCracken *v.* City of San Francisco.

and resolutions, did not intend to make a different rule from the one which they had already adopted in reference to general business. If this expression means that the assent of a majority of the members is sufficient to pass an ordinance, then it simply means that whenever a majority of the Board meet, a majority of that majority may pass an ordinance; in other words, that a quorum may meet, and a majority of that quorum pass an ordinance. This expresses, in a roundabout way, the idea that the majority of the Board shall be a quorum, which is the common law rule that "you must have a majority of a majority of any definite Board to transact business."

As the Legislature clearly intended to change the common law rule, the common law authorities on the subject of the number of votes requisite to a corporate act have no bearing on the case.

Again: further proof that the Legislature meant to depart from the common law rule is found in the fact, that whenever an important subject is provided for—one applicable to the entire city—the language is, "a majority of all the members elected to each Board"; and whenever a subject of little moment is provided for, or in case of the ordinary business of the corporation, the common law rule is laid down.

But it is contended that this provision means "a majority of the members then being in office who have been elected to each Board"; in other words, the entire words "then being in office" must be interpolated, and the words "elected to each Board" must be stripped of all meaning, before you can give this meaning. For in the sentence itself there is nothing that hints at the idea of confining this provision to the members then in office.

Now, where is there any warrant for thus interpolating these words, "then being in office." Is any such interpolation warranted by any common law construction? On the contrary, the common law does sometimes insert the words "who have been elected," but it never inserts the words "then existing."

Thus, in the words "a majority in each Board shall be a quorum." The common law interpolates the words "of the whole Board," so that the expression written out fully would read, "a majority of the whole Board shall be a quorum."

So in the English cases, the words construed were—"a majority of the then existing members." The Courts, for the purpose of restricting the power of a small number to vote for a large number, interpo-

lated the words, " provided that the then existing members shall be ,a majority of all the members elected to each Board."

We pass now to the meaning of this provision as shown by the nature, purpose and scope of the whole act.

The charter of the city of San Francisco, passed in 1851, divided the city into eight geographical wards. (See sec. 3, art. 1.) Each ward sent one Alderman and one Assistant Alderman to the Common Council. (See sec. 1, art. 2.) The Common Council itself provided for the filling of vacancies by ordinance. (Sec. 3, art. 2.) No one could be a member of the Common Council, except so long as he was a member of his ward. (See sec. 1, art. 3.)

Now, in a body constituted like this, it is necessary, first, that in the passage of laws and in the changing of the charter, the whole city should be represented. Such a construction, if possible, should be given to this power to pass ordinances, as would make it impossible for a minority of the wards of the city to impose laws on the majority. This corporation is not composed of members selected indiscriminately from the whole city. Each member is elected from a particular ward, and only continues a member so long as he continues to reside in that ward. The effect, then, of a vacancy is to leave the ward from which the retiring member came wholly unrepresented. If to this provision under discussion you give the meaning contended for on the other side, then, when there are three vacancies in these wards, there are three wards wholly out of existence, so far as the law-making power is concerned.

Second : In a body constituted like this, it is necessary when a member resigns, and a ward thus becomes unrepresented, that the remaining members should be under no temptation to perpetuate their own power by leaving that vacancy unfilled. The men who are left fill the vacancy. Their own power is augmented by each successive vacancy; and if there should be three vacancies in the Board, the government of the city is in the hands of three out of the remaining five. These three can maintain their power during the entire year. *Mandamus* would not lie to compel them to fill a vacancy, for an ordinance is a legislative act, and an Alderman cannot be compelled to vote aye when he chooses to vote no.

On the other hand, by the construction for which we contend, a vacancy gives no additional power to those who are left, and consequently puts them under no temptation to leave the vacancies unfilled.

McCracken *v.* City of San Francisco.

To pass an ordinance still requires the inflexible five—and the body whose duty it is to provide for the filling of vacancies is under no temptation to refuse to do its duty.

The Court will see that in the English cases, the Courts—in deciding that the words " majority of the inhabitants and burgesses for the time being " did not mean a majority of them, however small, but only a majority of them, provided such majority was equal to a majority of the original number—lay great stress on the fact that a contrary construction would place the members of the corporation under a great temptation to leave the vacancies unfilled, and thus to augment their own power. (See *Rex* v. *Bellinger*, 4 Term, 810 ; *Rex* v. *Devonshire*, 1 B. & C. 609 ; *Rex* v. *Morris*, 4 East, 26.)

II.   If there were any authority for said sale antecedently to the sale, it must be found in one or both of the two Ordinances Nos. 481 and 493, of the city of San Francisco.

In regard to Ordinance No. 481, it appears by the evidence that it received in the Board of Assistant Aldermen four votes in its favor to three against it.   It further appears, that at the time there was a vacancy in the Board of Assistant Alderman, so that there were but seven in office, out of the eight originally elected to the Board.   The vote of four to three, instead of passing this ordinance, was a direct, positive refusal to pass it.   No authority, then, comes from Ordinance No. 481 to make this sale, and the only other ordinance upon the subject prior to the sale is Ordinance No. 493.

There are two facts in this case which did not appear in *Holland* v. *The City of San Francisco*, and *Gulliver & French* v. *San Francisco*, which distinguish it from those cases.  The first fact is, that at the time of the passage of Ordinance No. 493, the land in controversy was covered by water, and was dedicated to public use as a free public dock, for ships and other vessels, by the following section of an ordinance passed in 1852.

" SECTION 8.   All the. space of land and water lying between Clay street and Sacramento street, and between Davis street and the deep waters of the bay, as laid down upon the public maps or plans of the city, is set apart and dedicated to public use as a free public dock, for ships and other vessels, provided, notwithstanding, that nothing herein contained shall prevent the Common Council from amending, altering or annulling this grant."

The second fact is, that the companies and William E. Dennis, men-

tioned in Ordinance No. 493, claimed that they would be damaged by the filling up of the slips, of which the land in controversy formed a part, and that the only consideration for the appropriation of this money to them was to recompense them for such damage.

### SECOND.

The city has never ratified said sale, and it is incapable of ratification; and the appellant never has acquired, and never can acquire, any right under it.

I.   The land in controversy was dedicated as a public dock, by an ordinance passed in 1852.   By the fifth section of Ordinance No. 481, it was proposed to repeal this dedicating ordinance, so as to vest a full, unincumbered title in the purchaser.   But Ordinance 481 was rejected, as we have seen.   If it ever passed at all, it was by the vote which passed Ordinance 493.   But to contend this, the reasoning must be as follows: Because Ordinance 493, by implication (not a necessary one) recognizes the existence of Ordinance 481, therefore it passed 481; because it authorized the disposition of a portion of the proceeds of a sale — it, by implication, authorized the sale; because by implication it authorized the sale—it, by another implication, repealed an ordinance granting the land to be sold to the public as a public dock.   In other words, we have one ordinance repealed and another ordinance passed by implication—not by direct legislative action—but by inference.   The statement of such a proposition shows its absurdity.

Judge Burnett, in his opinion in *Holland* v. *The City*, makes a distinction between the powers of a municipal government as the owner of public property and as a subordinate government.   Admitting this distinction, it will be seen that the Common Council, when in 1852 it granted this land to the public as a public dock, made that grant not as a property holder, but as a government.   It derived its whole power to do so from section thirteen of article three of the charter.   It was by virtue of its governmental powers to appropriate land to public use for public purposes that it made this grant; it was by virtue of its governmental powers that it retained its control over this public franchise, and it was to itself, as a government, that it reserved the right of determining when the franchise should cease.

II.   Ordinance 493 neither ratified, adopted or passed Ordinance 481.   The decision in *Holland* v. *The City of San Francisco*, (7

McCracken *v.* City of San Francisco.

Cal. 361) does not control this case.   On this point of adoption or ratification, out of the five Judges who have passed on the question, Judges Murray, Heydenfeldt and Norton have always held it to be absurd to speak of passing ordinances by adoption; Judge Burnett has decided that it could be done, and Judge Terry has decided both ways.

The Ordinance 493 does not indicate any intention to pass Ordinance 481, and by no possible rule of construction can it be made to bear a meaning not indicated on its face.   That all written documents, whether powers of attorney, deeds, contracts or laws, are so to be construed as to give full force to their meaning, is a rule without an exception.   What should make this ordinance an exception?

III.   The Charter of 1851 has restrained and limited the power of the Common Council in this matter of passing ordinances.

In the first place, ordinances involving the sale of land must be published after their passage by one Board, and before their passage by another; so that the intention of the Common Council to pass an ordinance for the sale of public lands must be publicly proclaimed in the newspapers.   Now, when in Ordinance 493 they published to the world that Ordinance 481 was already passed, and merely alluded to it by its number, they did not publish the ordinance involving the sale of these lands.

Ordinance 493 did not, therefore, authorize this sale.   The Mayor and Land Committee are nowhere mentioned in said ordinance, which is inconsistent with the idea that it was intended to confer a most important power upon them.   The disposition of a small portion of the proceeds of these sales cannot amount to a bestowal of the power to sell, since primary powers cannot be bestowed by the mere mention of secondary and surbordinate powers.   There is no necessary implication from the fact that proceeds are appropriated, that the mode taken to raise those proceeds was authorized.

The fact that, before the sale took place, the Common Council, by Ordinance 493, admitted the existence of Ordinance 481, does not show that Ordinance 481 was passed.   An ordinance can be passed in one way only, and that is by a vote.   Judge Burnett, in *Holland's case*, (7 Cal. 378) says: "If these views be correct, then Ordinance 481 was, in substance, a power of attorney well drawn, but defectively executed.   If it stood alone, any sale made under it would be void; and to ascertain this, it is necessary to inquire how far Ordinance 493 adopted and sanctioned Ordinance 481."

Now, Ordinance 481 was both well drawn and well executed; only the city, through the Common Council, had positively refused to assent to it. What, then, does the learned Judge mean by their subsequently sanctioning and adopting it? If, by the ordinance, he means the action which the Common Council took upon it; if he means that the Common Council, by passing Ordinance 493, sanctioned and adopted what they had previously done, then what the Common Council sanctioned and adopted was the refusal to pass Ordinance No. 481. The truth is, these words "sanction and adopt" only give rise to confusion/ Until Ordinance 493 was passed, there was no Ordinance 481. A proposition to pass such an ordinance had been before the Common Council, and had been rejected. The only question, then, is whether the Common Council, by Ordinance 493, for the first time passed Ordinance 481. There was until that time no act for them to sanction and adopt as the act of the city, unless it was to sanction and adopt their own refusal to pass Ordinance 481.

IV. If by any construction it could be contended that Ordinance 493, contrary to its manifest intention, amounted to an original authority to sell this land, the sale would be none the less void because it did not pursue the authority.

If Ordinance 493 amounts to an original authority to sell this land, it can only be on the ground that it passes and enacts Ordinance 481. Up to the time of the passage of Ordinance 493—that is, until a half an hour before the sale—the city had refused to authorize this sale. If, then, Ordinance 481 ever became an authority to sell this land, it became so when Ordinance 493 was passed, and not before.

If, then, the authority to sell this land was ever given, it was given one half hour before the sale took place. If the Common Council ever passed Ordinance 481, it was on the very day of the sale. But in that very ordinance, which on this hypothesis they pass thirty minutes before the sale, they ordain that ten days previous notice of the sale shall be given before it takes place. Ten days from when? Why, after the passage of this ordinance.

V. It is contended that these contracts have become binding on the city:

1st. Because of her subsequent ratification.

2d. Because the city would be estopped as against the respondent to deny the validity of these sales.

McCracken *v.* City of San Francisco.

To maintain the first point, that of ratification, the defense relies upon Ordinance No. 505, of the city of San Francisco, by which the Mayor and Land Committee are authorized to pay out of moneys in their hands the salaries of the police of the city.

Now, the principle of ratification is, " That when the adoption of any particular form or mode is necessary to confer the authority in the first instance, there can be no valid ratification except in the same manner." (12 N. H. 232; 15 Vt. 147; 8 Met. 301; 1 Shepley, 466.)   It is the people of the city of San Francisco who form the corporation of San Francisco, and the Common Council are but their agents.   The Common Council has only the powers specially or impliedly granted in the charter; so that, even if the corporation has power, by common law, to dispose of its lands as it chooses, this power cannot be exercised in this way by the Common Council.   The Council must follow the mode pointed out by the charter.   (3 Eng. 227; 5 Barb. Sup. Ct. R. 613; 2 Cranch, 127; 5 Conn. 666; 4 Eng. Law and Eq. 426; 4 Id. 497; 8 Cow. 44.)

1. Now, the only power to sell lands conferred upon the Common Council by the charter, is contained in sec. 12, art. 3.

By this section, the sale of lands must be by law; and the power to sell is put on the same footing with the power to pass laws for the general welfare of the city, and to affix penalties of sixty days' imprisonment to the violation of an ordinance.

2. Again, by section four, of article three, of the charter, it is provided that " every ordinance providing for any specific improvement, the creation of any office, or the granting of any privilege, or involving the sale, lease or other appropriation of public property, or the expenditure of public moneys (except for sums less than five hundred dollars)" shall, after its passage by either Board, and before being sent to the other, be published, with the ayes and noes, in some city newspaper.

It is true, that in this section it is not negatively expressed that there shall be no sale or lease unless by ordinance; but the inference is irresistible that such was the intention of the charter.

For, 1st. The only authority which the Common Council has in regard to lands, is a power to pass laws for the sale of them; and ordinance and law are synonymous when applied to municipal regulations.   (Burrill's Dict. Ordinance.)

2d. The object of section four, article three, is that publicity shall be given to the fact that the city lands are to be sold, and on what terms

and conditions; but this object would be defeated if the Common Council could, by a secret vote or a joint resolution, authorize a sale. This section renders imperative only the publication of ordinances. If an ordinance is not necessary, the Common Council, by selecting another mode of selling city lands, could get rid altogether of the necessity of advertising, and so defeat this entire section.

3d. The Mayor's veto extends to ordinances only, and the Common Council could deprive him of all power over city lands, if they could adopt any other mode of selling them. (Charter, art. 3, sec. 3.)·

A valid sale of city lands requires an ordinance or law passed for that purpose.

In this case, there was no ordinance passed prior to the sale, for the purpose of authorizing it. Two questions present themselves in regard to this point :

1st. Can a sale, unauthorized by any ordinance whatever, be ratified by an ordinance subsequently passed ?

2d. Has there, in fact, been any ordinance passed in this case, for the purpose of ratifying this sale ?

(1.) On the first point we contend, that a sale without any ordinance preceding it is absolutely void, and that it cannot be ratified, because there is nothing to ratify. (*Doughty* v. *Hope*, 1 Comst. 19.)

In the charter of San Francisco, laws for the sale of lands, laws for laying taxes or assessments, and laws creating offices or imposing penalties, are placed upon the same footing. (Art. 3, sec. 4, 13.) And if a law for the sale of lands can be passed, under the name of ratification, subsequently to the sale, so a tax or assessment can first be laid without authority, and afterwards ratified; even a penalty which had never been imposed by law could be first exacted, and afterwards such exaction could be ratified.

(2.) The Common Council being themselves but agents, cannot delegate their power to sell the city lands, and consequently cannot ratify a sale made by others. (*Delafield* v. *The State*, 2 Hill ; 12 Mass. 249 ; 1 Rolls' Abridg. 330 ; 9 Co. 276 ; 7 Ves. 251 ; 4 Camp. 194 ; 6 Taunt. 197 ; 11 How. 223 ; *Smith* v. *Morse*, 2 Cal. 539.)

As to ratification of Ordinance 481 by Ordinance 505, passed after the sale, we say :

1st. Its title shows that it was passed for a purpose wholly unconnected with this sale.

2d. There are no terms of ratification.

3d. The fact that it recites Ordinance 481 as the authority for the sale, shows that it supposed Ordinance 481 to be valid and complete in itself—and therefore, on its face, it is clear that there was no intention of ratifying what was supposed not to stand in need of ratifying.

4th. It merely appropriates money which, actually, was in the power of the city, to a certain object. But such an appropriation does not make the *mode* by which that money was raised legal and valid.

5th. Not only is there no implication, from the fact that the Common Council appropriated certain proceeds actually in the hands of the Mayor and Joint Committee on Land Claims, that they intended to ratify these sales, but even if there were such an implication, it would not avail to ratify such sales, since Ordinance 505 shows on its face, that when it was passed by the Common Council, that body was laboring under an error, in supposing that there was such an ordinance as 481. The ratification, if made at all, must be made by the principal, with full knowledge of all the facts, and he would not, but for such ratification, be bound. (Dunlap's Paley's Agency, 171, note *q*; 9 B. Monroe, 415; 4 Eng. Law & Equity, 426.)

6th. If Ordinance 505 is a ratification, the ratification would be one implied by law, and would not result from any express vote of the Common Council to ratify.

(3,) By article six, section six, of the charter, all sales and leases of city property must be by public auction; and where an agent is authorized to sell at public auction only, all sales not made by public auction are void.

As, therefore, the ratification of a contract must be in the same manner and mode as would have been antecedently necessary to a valid contract, it follows that there could be no ratification of these sales, unless such ratification were by public auction.

But in the nature of things, there can be no ratification at public auction, to a particular person, and for a specified price. It is of the essence of a public auction, that every one should have a right to bid, and that he who offers the highest price should be the purchaser.

It is contended on behalf of the city:

1st. That if the city be estopped as against the appellant to deny the contract, the appellant is bound to avail himself of this estoppel and cannot recover back his money.

2d. That the city is estopped as against appellant to deny this contract.

McCracken *v.* City of San Francisco

In the first place, the appellant would not be estopped from showing the truth, even if the city would be so estopped.

The city is a corporation, deriving its whole being and all its powers from the charter. If it transcends those powers, or exercises them in a different mode from the one prescribed in the charter, it is violating an express law of the State. It is a wrong-doer. Now the city has not made this contract, either by ordinance, by public auction, or by a direct vote of the Common Council.

This whole estoppel relied upon is an estoppel *in pais.* Now there is not necessarily any mutuality in an estoppel *in pais.* A man may tell a lie, and induce action by inducing the belief that it is the truth, but we have never heard that the liar could prevent the person to whom the lie was told from showing the truth. The very principle on which this doctrine of estoppel *in pais* rests, requires that the wrong-doer should not take advantage of his wrong—that he should not insist that he had lied, and by his lie gained an advantage over his opponent.

It is only the wrong-doer who is estopped as against the person misled; but the person misled is not estopped as against the wrong-doer. That is, the doctrine of estoppel *in pais* is simply in consonance with common honesty and common sense. (Adol. & Ell. 476; Smith's Leading Cases, title Estoppel.)

The authorities to the point that a corporation may be estopped like an individual, are cases where the action was against the corporation, and it was sought to estop the corporation. But we have not seen a case where the corporation was allowed in this way to take advantage of its own wrong. The distinction which we have taken is asserted in 2 Conn. 257–254; 12 Wheat. 76; Marshall's Opinion, 2; *Bank* v. *Chilcothe,* 7 Ohio, 358.

In the next place, it would be unjust to force us to take a title which rests for its whole validity on an estoppel *in pais,* when we supposed we were contracting for a title authorized by an ordinance duly passed.

But there is in this case no estoppel even on the city, to prevent her from showing the truth. Estoppel is either by record, deed, or *in pais.* An ordinance is neither a record nor a deed. As to estoppel *in pais,* to give acts or declarations the character of an estoppel, it must appear that they have influenced the conduct of the party by whom the estoppel is sought to be enforced. (9 Wend. 482; 4 Barb. 495; 6 Pick. 457; 15 Mass. 152; 5 Watts & Serg. 284.) This rule excludes ordi-

nance 493, and all the ordinances, joint resolutions and matter subsequent to the sale. Ordinance 493 was only passed half an hour before the sale, and it does not appear that it was even known to appellant. The matter subsequent to the sale cannot, of course, be relied upon as an estoppel *in pais,* since it could not have influenced the conduct of the parties.

If, then, there is any matter which appellant could rely upon as an estoppel here, it would be the fact that this sale was advertised as the city sale, that this ordinance was published as a city ordinance.

But it does not appear that there was any fraud or wilful intention in this case to mislead. There was simply an error on the part of the city agent; and where a party makes an admission in good faith, under the influence of a mistaken impression as to the nature and extent of his rights, either in fact or law, no estoppel arises. (20 Conn. 98; 4 Met. 69.)

### THIRD.

It is urged that the city cannot be liable for more than fifty thousand dollars above her aggregate indebtedness; that she cannot create or suffer to accrue this liability. We think, that as no one could ever know what the state of her business or accounts was, that no one (without this knowledge at any rate) could be bound by this limitation: any more than if a bank could only, by charter, issue three hundred thousand dollars, and if she issued other notes, these last notes would fall dead in the hands of an innocent holder. But that this is not the doctrine, see *Moss* v. *Rossie Lead Mining Co.* 5 Hill, 137.

Again: This limitation refers to the acts or contracts of the corporation—not to the liabilities which the law casts upon her. We say that the city got our money by mistake. She is responsible for our money: for what she got from us, because the law (not her contract or permission) makes her liable as a necessary condition of her existence. She could not, by any provision in her charter, evade this liability. The Constitution guarantees to every man redress for the taking of his property or deprivation of his rights, whether by a corporation or person. This liability is wholly independent of any power to contract. A minor is as liable for taking and converting money—*a femme covert* —a lunatic—as any one else. The law says: "You have got A's money without right—pay it back to him." There is no promise—no contract. There is a moral duty to return it, and this moral duty makes the liability. *Could the city owe herself out of liability?* But

we might rest on the very terms of the proviso.   It does not refer to torts, or trespasses, or to cases of liability arising from these, or from mistakes or frauds, or the acts of agents; much less to cases in which the liability is created by law; it would not include taxes laid by the State upon the real estate of the city; nor trust money held by the city; nor money received by the city through mistake, or the fraud of the agents of the city.   A statutory provision must be strictly pursued.   (See 4 Cranch, 403; 4 Wheaton, 77; 10 Peters, 161.)   Even Chancery will not relieve a defective execution of a power created by law, or dispense with any of the formalities required thereby for its due execution; for otherwise the whole policy of the legislative enactment might be overturned.   (1 Story's Eq. sec. 96; 1 W. W. Story, 487.   See also 3 S. & M. 727.)

FOURTH.

Money paid under a contract void for want of authority in one of the contracting parties, may be recovered, though a deed has been given.   (19 Johns. 73; 7 Mass. 31; 5 Pick. 480; and particularly 1 Gilman, 150.)

The holding out a person, by a corporation, is equivalent to an agency, so as to justify a person in accrediting him.   (12 Wheat. 89; *Bank of U. S. v. Dandridge.*)

Here the Land Committee were held out and published as having this authority to sell and receive this money, and it was subsequently brought under the control of the corporation : " they were persons acting publicly as officers of a corporation, and presumed to be rightfully in office; their acts bind the corporation, though no written proof is or can be adduced of their appointment; for the law will not sanction the fraud of a corporation sooner than that of an individual."   (Story, J. 12 Wheat. 70.   Angel & Ames on Corp. 314, sec. 284.)

Further, these misrepresentations were by the unauthorized agents of a municipal corporation, as to the extent of their authority.   They could not, therefore, bind their principal.   (1 Shep. 46; 8 Gill & Johns. 319.)

The appellant has paid to the city, and the city has received of the appellant, the sum of money mentioned in the complaint, and has received no consideration therefor, and may recover it back.

The distinction between this case and cases where eviction is necessary to enable the purchaser to recover, is this.   In this case, there never was any contract on the part of the city to sell this land to

McCracken v. City of San Francisco.

appellant, and appellant derives no right from the city; appellant is not in possession, deriving authority from the city. The title, the city still retains. Appellant is holding adversely to the city, as a mere trespasser.

The cases where possession must be given up before an action can be commenced for the purchase money, are those cases where the vendee seeks to rescind a contract on the ground of defective title; there has been a contract made; the vendee has a right to whatever title the vendor has. Before he can rescind, he must restore what he he has got possession of under contract. (6 Blackf. 24; 6 How. 273; 1 Freeman's Ch. 332.)

*F. M. Haight*, for Respondent.

I.   The Ordinance No. 493 recognized and adopted the proceedings taken in accordance with the terms of Ordinance No. 481.

The case of *Holland v. The City of San Francisco* (7 Cal. 361) is conclusive upon the point, and unless overruled, must determine the present action. The facts of the two cases are substantially the same.

II.   The sale of the slip property was subsequently ratified by the city.

1. An Ordinance, No. 505, was passed January 10th, 1854, by which the Mayor and Land Committee were authorized to pay the salaries of the members and officers of the police from moneys received by them from the sale had under Ordinance No. 481.

2. Various joint resolutions were passed in January, April, and September, 1854, in which the sale was referred to, and its proceeds appropriated, and the Land Committee released from responsibility on account of notes and warrants received by their secretary, as proceeds of the sale, which were attached, in suits against the city, whilst in his hands.

3. The reports of the Land Committee and of the City Treasurer, in relation to the proceeds received from the sale, were accepted and approved. (Story on Agency, sec. 253; Dunlap's Paley on Agency, 171, notes; *Richmond Manufacturing Co.* v. *Starks et al.*, 4 Mason, 296; *Forrestier* v. *Boardman*, 1 Story, 43; *Bridge* v. *The Niagara Ins. Co.*, 1 Hall's Sup. Court, 247; *The Farmers' Loan Co.* v. *Walworth*, 1 Com. 433; *Mason* v. *Caldwell*, 5 Gilm. 196.)

III.   The city is estopped, as against the plaintiff, from denying the sale; and therefore the plaintiff cannot be disturbed in his possession. He cannot complain; and, until disturbed, cannot maintain an action for the purchase money.

McCracken *v.* City of San Francisco.

IV.   The plaintiff has not offered to surrender the possession of the premises to the city, and such surrender is a condition precedent to a recovery.   He can have no cause of action until such surrender. (*Rathbone* v. *Stocking*, 2 Barb. 135; *Moyer* v. *Shoemaker*, 5 Id. 319; *Masson* v. *Bovet*, 1 Denio, 69; *Abbott* v. *Draper*, 4 Id. 51; *Peters* v. *Gooch*, 4 Blackf. 515; *Boas* v. *Updegrove*, 5 Barr, 516.)

V.   The city cannot become liable beyond the limit of $50,000, prescribed by her charter.

FIELD, C. J. delivered the following opinion:

This is an action to recover the sum of $2,100, with interest from the twenty-sixth of December, 1853, and arises upon the following facts: On the fifth of December, 1853, the Mayor of San Francisco approved of what purported to be an ordinance passed by the Common Council of the city, providing for the sale of certain city property. This ordinance, so called, is designated in the official book of the ordinances of the city, as Ordinance number four hundred and eighty-one. In terms it authorized and required the Mayor and Joint Committee on Land Claims of the city to sell the property specified at public auction, to the highest bidder, at such time and place as they might think advisable, after not less than ten days advertisement in three daily papers; and provided that twenty-five per cent. of the purchase money should be paid on the day of sale, and fifty per cent. in sixty days thereafter, and the balance in four months.   It is also provided that the Mayor, upon the first payment, should execute a bond to the purchaser, to the effect that upon the payment of the entire purchase money, the city should give a deed for the property purchased, and that upon payment of the last installment, the Mayor should execute the deed.

At the time this ordinance was presented to the Board of Assistant Aldermen, and was acted upon by that body, there was a vacancy in the Board, occasioned by the resignation of one of its members, so that there were, in fact, but seven members in office.   Of these seven, four members voted for the passage of the ordinance, and three against it. It is admitted that the sale, which took place on the twenty-sixth of December, 1853, was conducted in accordance with the directions of the ordinance.   At the sale the plaintiff became the purchaser of a portion of the property, and paid at the time, as the first installment upon his purchase, the sum of $2,100.   It is for the recovery of this sum, and interest, that the present action is instituted.

McCracken *v.* City of San Francisco.

It appears from the record, that within one hour previous to the sale the Common Council passed the following ordinance:

Ordinance No. 493, appropriating $185,000 to the Sacramento Central Joint Stock Clay Street Wharf Company and William E. Dennis:

*The People of the City of San Francisco do ordain as follows:*

SECTION 1.   That the sum of $185,000 be and it is hereby appropriated from the cash proceeds of the second payment for the city property ordered sold by Ordinance number four hundred and eighty-one, to the Sacramento Joint Stock Clay Street Wharf Company and to William E. Dennis.

SEC. 2.   That the Controller be and he is hereby authorized to issue, on the day of sale of the property ordered sold by ordinance four hundred and eighty-one, his warrants upon the treasury, as follows: For the sum of $75,000, in favor of the Sacramento Street Wharf Company; for the sum of $75,000, in favor of the Central Wharf Joint Stock Company; for the sum of $35,000 in favor of William E. Dennis; said warrants shall be payable from the cash proceeds of the second payment for the property ordered sold as aforesaid, or shall be received in payment for any purchases made at said sale, in accordance with the terms of Ordinance number four hundred and eighty-one.

At the time of the passage of this ordinance, the land directed to be sold was covered by water, and was dedicated to public use as a free public dock for ships and other vessels by the following section of an ordinance passed in 1852: "Section 8. All the space of land and water lying between Clay street and Sacramento street, and between Davis street and the deep waters of the bay, as laid down upon the public maps or plans of the city, is set apart and dedicated to the public use as a free public dock for ships and other vessels; provided, notwithstanding, that nothing herein contained shall prevent the Common Council from amending, altering or annulling this grant." The last section of Ordinance 481 in terms repealed this section, and the wharf companies and William E. Dennis, mentioned in Ordinance 493, claimed that they would be damaged by the filling up of the slips, of which the land directed to be sold formed a part, and it was to recompense them for such damage that the appropriation was made.

On the day following the sale, the Mayor executed to the plaintiff the bond required by Ordinance 481, and on the sixteenth of March, 1854, the last installment of the purchase money having been paid,

40

the Mayor executed to him a deed for the property purchased. The plaintiff entered into possession some time in March, 1854, and was in possession at the institution of the present action. Since then, he has quit-claimed his interest to a party who was fully cognizant of all the circumstances of the case.

The plaintiff bases his right to recover upon the ground that the sale was made without authority from the city, and that he did not in consequence acquire the title for which he parted with his money.

If there were any authority for the sale, it is to be found in Ordinance 481. At the time this ordinance was acted upon by the Board of Assistant Aldermen, there was a vacancy in that body, as we have already stated, occasioned by the resignation of one of its members, and only four of the members remaining in office voted for its passage. The ordinance did not, therefore, receive the necessary vote for its passage required by the charter then in force. The second section of the third article of that charter declared that no ordinance or resolution should " be passed, unless by a majority of all the members elected to each Board;" and in the case of *The City of San Francisco* v. *Hazen* (5 Cal. 171) this Court held, that inasmuch as the charter provided that eight members should be elected to each Board, the section in question had reference to that number, and the vote of any number less than a majority of the entire Board—of its constituent number—was insufficient to pass an ordinance. The ordinance in question, therefore—number 481—was never passed. It was, in fact, rejected. It was, standing by itself, for all purposes whatever, an absolute nullity. This conclusion is not controverted by the defendant; but to obviate its effect in the determination of the case, it is contended— First, that Ordinance 493 recognized and adopted the proceedings taken in accordance with the terms of Ordinance 481 ; and Second, that the sale of the property was subsequently ratified by the city. We will consider both of these positions :

1. It is not pretended that Ordinance 493 of itself conferred any authority to make the sale; it does not purport to confer any such authority; it only purports to appropriate certain proceeds of the intended sale. The proposition advanced is that the recognition in 493 of the existence of the previous ordinance, and the appropriation of a portion of the proceeds, constituted an adoption and approval of all that had been previously done or might be subsequently done in pursuance of the terms of that ordinance, and thus gave validity to the

sale. It is evident that whatever operation is to be attributed to Ordinance 493 must arise from the appropriation it makes. The recognition of the previous ordinance, independent of that appropriation, could have no possible effect. There is nothing adoptive or approving in the mere reference to previous legislation, whether valid or invalid. It is, then, upon the appropriation alone that the proposition must rest; and that this did not and could not operate as such an adoption of the proceedings taken under the rejected ordinance, as to give validity to the sale, is evident from the provisions of the charter relating to the disposition of the city property. The thirteenth section of the third article provided that the Common Council should "have power within the city to pass all proper and necessary laws for the regulation, improvement and sale of city property; for the levy and collection of city taxes on all taxable property, not to exceed one per cent. a year upon the assessed value; for the laying out, making, opening, widening, regulating and keeping in repair all streets, roads, bridges, fences, public places and grounds, wharves, docks, piers, slips, sewers, wells and alleys, and for making the assessments therefor; for regulating and collecting wharfage, dockage and cranage upon all water craft and all goods landed; for securing the protection, health, cleanliness, ornament, peace and good order of the city; for the prevention and extinguishment of fires," etc.

By this section the power to sell the city property was placed on the same footing with the power to levy taxes, grant licenses and to pass laws for the government of the city. By this section all the authority was conferred which could be exercised by the Common Council upon the subject. They were the mere agents of the corporation, and possessed only such powers as were specially delegated to them by the charter, and when that instrument granted a power with a specific designation as to the mode in which it should be used, the mode was restrictive—no other mode could be followed.

In *Head and Amory* v. *The Providence Insurance Company*, (2 Cranch, 169) Chief Justice Marshall, in speaking of bodies which have only a legal existence, said: " The act of incorporation is to them an enabling act; it gives them all the power they possess; it enables them to contract, and when it prescribes to them a mode of contracting, they must observe the mode, or the instrument no more creates a contract than if the body had never been incorporated." And in the case of *The Farmers' Loan and Trust Company* v. *Carroll* (5 Barb. 49) the Supreme Court of New York said: " When a corporation relies upon a grant of

power from the Legislature for authority to do an act, it is as much restricted to the mode prescribed by the statute for its exercise, as to the thing allowed to be done." (See also *The New York Firemen's Insurance Company* v. *Ely et al.* 5 Conn. 568.) The power, therefore, in the sale of the city property could be exercised only by the passage of *laws* for that purpose. Ordinances and laws are synonymous terms when applied to acts of municipal corporations. They are thus used in the charter. (Art. 3, sec. 3.)

Ordinance 493 is not a law providing for the sale of any property; nor does it purport to be anything of the kind. It does not describe any property, or direct any sale, or confer authority upon any parties to sell. It assumes that an ordinance ordering the sale had already passed, and refers to it for the simple purpose of appropriating certain proceeds of the sale. This assumption imparted no vitality to the rejected ordinance, which was referred to as having passed. The Common Council could not in this way recall the rejection and give validity to the supposed ordinance. This would be in effect to pass an ordinance by referring to it as passed, or by admitting that it had passed. The Common Council could pass an ordinance only in one way, and that was by voting for it. To give validity to the sale, a law directing the same was requisite. Nothing less would answer under the charter.

Again, the land directed by the terms of Ordinance 481 to be sold, was set apart and dedicated as a public dock, by an ordinance passed in 1852. The fifth section of 481 was directed to the repeal of this latter ordinance; but of course the repealing section fell with the rejection of the ordinance. In dedicating the land to public use, the Common Council exercised powers purely of a governmental nature, and not those of a mere property holder. Whilst the dedicating ordinance remained in force, no sale could be legally had. Number 493 makes no reference to that ordinance, and of course does not purport to repeal the same, either directly or otherwise.

The untenable character of the doctrine involved in the proposition advanced by the defendant will be apparent, when the doctrine is applied to the different subjects upon which the Common Council are authorized to legislate. They are authorized, for example, to levy taxes. An ordinance imposing a tax is introduced into one of the Boards, and rejected. The City Collector, however, proceeds upon the assumption of the passage of the ordinance, and advertises property for sale for the supposed taxes. The owner of the property pays no

McCracken v. City of San Francisco.

attention to the proceeding; he knows that the ordinance was rejected, and the levy is illegal. The Common Council, however, previous to the time of the advertised sale, pass an ordinance appropriating a portion of the proceeds anticipated from the sale, and this appropriation gives validity to the levy, and to the acts of the officer, and the subsequent sale of the property. To this result the doctrine necessarily leads. If a sale of the city property, without an ordinance directing the same, can be upheld from the appropriation of the anticipated proceeds, the levy and acts of the collecting officer must be sustained from the like appropriation.

The distinction taken between the powers of a municipal corporation, when acting in its political and governmental character, and when acting with reference to its private property, has no application to the questions involved in the case at bar. Its powers, whether regarded as political or governmental, or those of a mere private corporation, could be exercised only in conformity with the provisions of the charter. The Legislature could impose such restrictions as it thought proper; and it saw proper to require the formalities of legislation for the disposition of the city property, as it did for the imposition of taxes, the regulation of the Fire Department, and matters connected with the general welfare of the city. Besides, the repeal of the ordinance setting apart and dedicating the property as a public dock was necessary, as we have already stated, to the validity of any sale. It was by the exercise of governmental powers that the property was dedicated to public uses. It was by legislation, in the strict sense of the term, that the dedication was made, and only by legislation could the public franchise be destroyed. No such legislation was ever had.

It follows, from the views we have expressed, that Ordinance 493 gave no sanction to the proceedings of the Mayor and Land Committee, and that the sale made by them was without authority and void, as much so as if it had been made by strangers to the city and its government.

The case of *Holland* v. *The City of San Francisco* is cited as authority for the proposition that the proceedings of parties, assuming without authority to act on behalf of the city, may be adopted by a subsequent ordinance. In that case, a claim similar to that of the plaintiff was passed upon, and held invalid. The opinion was delivered by Mr. Justice Burnett, Mr. Justice Terry concurring, and Mr. Chief Justice Murray dissenting. In that case, the fact that the property

had been previously dedicated to public use, as a public dock, was not presented. This fact distinguishes that case from the one at bar. Even upon the reasoning of Mr. Justice Burnett, it would hardly have been contended that the admission supposed to be contained in Ordinance 493 operated as a repeal of the public grant. But aside from this consideration, even were the facts in the two cases precisely similar, we should not follow the ruling of that case, for, in our judgment, it is manifestly erroneous—setting aside fundamental principles of the law of corporations, which, however much distorted or departed from, will constantly reassert themselves. Mr. Justice Burnett first holds that the city, under the provisions of the charter, can only make a valid sale of the city property by the passage of an ordinance authorizing the sale. In this view we agree with him. He further holds, however, that Ordinance 493 recognized and adopted Ordinance 481, so as to render the subsequent sale valid and binding upon all parties —that is to say, to be consistent with his first position, that Ordinance 493, by the fact that it recognizes the previous ordinance as having passed, and appropriates a portion of the anticipated proceeds of the sale, actually passed that previous ordinance, recalled its rejection, and made it as valid an ordinance as if it had originally received the vote required by the charter. If this be not the doctrine advanced by the learned Justice, we confess ourselves unable to understand the opinion. To this doctrine we never can yield our assent. It is unsound in principle and is unsupported by any authority, and could it be maintained, would break down and destroy all the checks imposed by the Legislature upon the exercise of the powers of the Common Council. Upon this doctrine that body could at any time adopt the unauthorized acts of others, in the levy of taxes, in the sale of public property, in the opening of streets, in the infliction of penalties, and by admitting in one ordinance that it had previously passed an ordinance for those purposes, give validity to those acts.

But admitting that Ordinance 493 did adopt and pass 481, it did so only within one hour previous to the sale. Ordinance 481, upon that supposition, had validity only from that time. But this ordinance directs the sale upon ten days' previous advertisement. This means, of course, after the passage of the ordinance—that is, from the time it acquired validity, which was only within one hour previous to the time the sale took place. The authority to sell upon ten days' notice was not, therefore, pursued, and the sale without such notice was void.

2. The alleged subsequent ratification of the sale is based upon the following acts and proceedings of the Common Council:

First : Upon the Ordinance numbered 505 in the official book of ordinances of the city, passed on the tenth of January, 1854, by which the Mayor and Land Committee were authorized to pay out of moneys in their hands arising from the sale ordered by Ordinance 481, the salaries of the members and officers of the police, for the months of November and December of the previous year.

Second : Upon joint resolutions passed in January, April and September, 1854, by which the sale was referred to, the proceeds were appropriated, and the Land Committee released from responsibility on account of promissory notes and warrants received as proceeds of the sale by their Secretary, and subjected to attachment in suits against the city whilst in his hands.

Third : Upon the acceptance of the reports of the Land Committee and of the City Treasurer, in relation to the proceeds received from the sale.

To determine the effect of these acts, as a ratification of the sale, it is necessary to consider the conditions essential to a valid ratification. To ratify, is to give validity to the act of another. A ratification is equivalent to a previous authority. It operates upon the act ratified in the same manner as though the authority had been originally given. It follows, as a consequence, that where the authority can originally be conferred only in a particular form or mode, the ratification must follow the same form or mode. Thus, if an authority to execute a deed of a private person must be under seal, the ratification of the deed must be also under seal ; and where an authority to do any particular act on the part of a corporation can only be conferred by ordinance, a ratification of such act can only be by ordinance.

In the case of the *Dispatch Line of Packets* v. *Bellamy Man. Co.* (12 N. H. 232) a mortgage of real and personal property belonging to the corporation was executed by a person acting without authority, but assuming to be the agent of the defendants, and it was held that so far as the real estate was concerned, there could be no ratification of the mortgage without a vote of the corporation, as the authority to execute a mortgage of that nature could not be originally conferred except by a vote. " There is here," said the Court, " no vote of ratification, either by the corporation or by the directors ; and we are not aware of any authority which will justify us in going further, and holding that a deed

of real estate may be ratified by a corporation without vote or writing."
And again : "A ratification of an act done by one assuming to be an
agent relates back, and is equivalent to a prior authority. (Story on
Agency, 235, 239.) When, therefore, the adoption of any particular
form or mode is necessary to confer the authority in the first instance,
there can be no valid ratification, except in the same manner. If a
sealed power were not necessary to this as a conveyance of the real
estate, but a written vote would have been sufficient, because a corpora-
tion may constitute an attorney by vote for such purpose, then such vote
at least must be held necessary to a ratification." (See, also, *Pratt et al.*
v. *Town of Swanton*, 15 Vt. 147 ; and *Chamberlin* v. *The Inhabitants
of Dover*, 13 Maine, 466.)

It follows, also, from the general doctrine, that a ratification is equiv-
alent to a previous authority, that a ratification can only be made when
the principal possesses at the time the power to do the act ratified. He
must be able, at the time, to make the contract to which by his ratifica-
tion he gives validity. The ratification is the first proceeding by which
he becomes a party to the transaction, and he cannot acquire or confer
the rights resulting from that transaction, unless in a position to enter
directly upon a similar transaction himself. Thus, if an individual, pre-
tending to be the agent of another, should enter into a contract for the
sale of land of his assumed principal, it would be impossible for the
latter to ratify the contract, if between its date and the attempted ratifi-
cation he had himself disposed of the property. He could not defeat
the intermediate sale made by himself, and impart validity to the sale
made by the pretended agent, for his power over the property or to
contract for its sale would. be gone. So, also, contracts made upon an
assumed agency for a single woman cannot be ratified by her after mar-
riage, without the consent of her husband, for her power to contract
alone ceases with her marriage.

If we apply these principles to the case at bar, the question of
ratification will be one of easy solution. By the charter, the Com-
mon Council could authorize a sale of lands only by an ordinance
passed for that purpose, (art. 3, sec. 4) and such sale could only be
made at public auction (art. 6, sec. 6). The ordinance was required to
be published in some newspaper of the city after its passage by one
Board, before its consideration by the other Board. The object of this
requisition was threefold : first, to guard against fraud on the part of the
Common Council in the disposition of the city property ; second, to

apprise the public of the terms of sale, that every one might have an opportunity of purchasing, if he desired, in case the sale was ordered; and, third, to give an opportunity to the public to suggest objections or amendments to the sale or to its terms.

From this provision as to publication, the counsel of the appellant contends with great force that a sale of the city's lands, without an ordinance *previously* passed, was incapable of ratification, independent of any consideration of the mode required by public auction. It is unnecessary at this time to express any opinion on the proposition. It is clear that no ordinance ratifying the sale was ever passed. The joint resolutions, and the acceptance of the reports of the Mayor and Land Committee and of the City Treasurer, in reference to the moneys received from the sale, may be laid out of consideration. The authority for the sale could originally have been granted only by ordinance, and could only be ratified in the same manner—by ordinance. No ordinance referring to the sale was passed, except Ordinance No. 505, That ordinance is entitled " An Ordinance to provide for the Payment of the Officers and Members of the Police." By it the Mayor and Land Committee were authorized to pay, out of the moneys in their hands arising from the proceeds of the sale ordered by Ordinance 481, the officers and members of the police, for the services rendered by them in the months of November and December of the previous year. Its only purpose was to dispose of certain proceeds of the sale. It contains no terms of ratification. It does not contemplate that any ratification was necessary. It assumes that Ordinance 481 was valid, and refers to it as the source of authority for the sale. It only appropriates certain moneys, and it is plain that the appropriation did not give validity to the mode by which the money was obtained. The appropriation of moneys collected for taxes illegally assessed would, to the same extent, give validity to the assessment and levy. There is nothing, then, in the appropriation from which an intention to ratify the sale can be implied; and if the intention to ratify under some circumstances could be thus implied, the implication would be of no avail in the present case, since it is manifest that the Common Council were at the time laboring under the mistaken impression that Ordinance 481 had become law. Ratification, to be effective, must be made with full knowledge of all the facts relating to the act ratified. To entitle, therefore, any proceedings of the Common Council to the slightest consideration as evidence of ratification, it must be shown that those pro-

ceedings were taken with full knowledge that the ordinance had never passed, and that the sale thereunder was an absolute nullity. (*Owings* v. *Hull,* 9 Pet. 629 ; Story on Agency, sec. 243 ; *Fletcher* v. *Dysart et al.,* 9 B. Monroe, 415 ; Dunlap's Paley's Agency, 171, note *q.*)

Again : the sale was required to be made at public auction. (Art. 6, sec. 6.) This mode was essential to the validity of any sale. A sale in any other mode would have been a nullity. A ratification of a sale of this character can only be made where the party ratifying possesses such right with reference to the property that he can sell absolutely at private sale. He may then ratify the sale without reference to its mode, whether made privately or publicly. But when his power in the sale of the property can only be exercised by public auction, he cannot ratify a previous sale. The object of the ratification is to vest in the previous purchaser the title ; but at public auction there would be no certainty of this, for at the auction every one would be at liberty to bid, and the property would fall to the highest bidder. Apply this principle to the case, and it will be evident that a ratification by the Common Council of the unauthorized sale was impossible. The purchasers at that sale acquired no title ; the object of the ratification is to give them one, and for that end the sale must be confirmed to them separately at the prices already offered—that is, a sale must be made to them privately, which does not lie within the power of the Common Council. They can sell only at public auction, and this fact precludes the possibility of ratification by them of the previous sale.

The question of ratification being disposed of, it only remains to consider the objections taken to a recovery by the plaintiff, on the grounds :

First : That the city is estopped as against the plaintiff from denying the sale.

Second : That the plaintiff has not offered to surrender the possession of the premises.

And third : That the city cannot become liable beyond the limit of $50,000, prescribed in the charter.

1. The subject of estoppel was fully considered in the case of *Biddle Boggs* v. *Merced Mining Co.* (14 Cal. 279). We there held that to conclude a party by his declarations or conduct from asserting a title to property against another, it must appear—" first, that the party making the admission, by his declarations or conduct, was apprised of the true state of his own title ; second, that he made the admission with the express intention to deceive, or with such careless and culpable negli-

gence as to amount to constructive fraud; third, that the other party was not only destitute of all knowledge of the true state of the title, but of the means of acquiring such knowledge; and, fourth, that he relied directly upon such admission, and will be injured by allowing its truth to be disproved."

Tested by these rules, it is evident that there is nothing in the conduct of the city which can operate as an estoppel against her denial of the sale and her assertion of title to the prorerty. The matters relied upon by way of estoppel, with the exception of Ordinance 493, occurred after the sale, and they could not, as a matter of course, have influenced the plaintiff in his purchase. Ordinance 493, directing an appropriation of a portion of the anticipated proceeds, was passed within one hour of the sale, and it nowhere appears that the same was ever brought to the notice of the plaintiff. Nor does it appear that there was any fraud or intention to deceive on the part of the Common Council. They acted, in passing Ordinance 493, and in the subsequent use of the proceeds, upon the impression that a valid ordinance authorizing the sale had been passed. But if the city would be estopped from denying the sale and from asserting title to the property, it does not follow that the plaintiff would be estopped from claiming a return of the money he paid. The doctrine of estoppel *in pais* is applied to prevent a wrong-doer from asserting claims against his declarations or conduct; not to prevent an innocent party from enforcing his rights. It is the wrong-doer who is estopped, upon the principle that he shall not take advantage of his own wrong. In the plain Saxon of the counsel, " a man may tell a lie, and induce action by inducing the belief that it is the truth, but we have never heard that the liar could prevent the person to whom the lie was told from showing the truth." It would, indeed, be against common honesty and common sense to permit a party to allege that he had done wrong; that he had made false representations, had obtained money from an innocent party thereby, and had used it; and being in consequence estopped from denying the truth of his representations, the innocent party is also precluded from questioning their truth.

If the Common Council could set up an acquiescence in their own wrongful acts as a defense to the assertion of rights consequent upon a reliance upon such acts, the limits imposed by the charter upon the exercise of their powers would be useless. They would only have to say, we have done wrong; we have violated the charter, and misled

others; we are estopped in consequence from questioning the validity of our own acts; therefore, the parties misled are estopped also. There is no reason or authority for the proposition. (*Bank of Chilicothe* v. *The Town of Chilicothe*, 7 Ohio Ham. 358; *Balkley et al.* v. *The Derby Fishing Co.*, 2 Conn. 252; 2 Smith's Leading Cases, notes to the *Duchess of Kingston's case*, by Hare & Wallace.)

2. No surrender of possession of the premises was necessary to give the plaintiff a cause of action. There was no contract on the part of the city, and the plaintiff derived no right from the city, and is not in possession by any permission from the city. The bond executed by the Mayor, and the deed subsequently delivered, were unauthorized acts, as much so as if they had been done by a stranger to the city. They were not the acts of the city. They are to be regarded, therefore, as they were, in fact, for any efficacy which they imparted, as mere blank paper. The title remained unaffected in the city afterwards equally as before. The parties deriving posession from the plaintiff are simple trespassers, who can at any time be ejected from the premises by action on behalf of the city. The cases where possession must be surrendered, before action for the purchase money can be brought, are those where a contract has been made, and possession has been taken thereunder, and the vendee seeks to rescind the contract, on the ground of defective title, or the inability of the vendor to perform the contract on his part, or of some fraudulent representations inducing its execution. In these cases, the vendee must first offer to restore whatever he has received, before he can call upon the vendor to refund the purchase money. Where the contract is void, there is nothing to rescind; no rights are acquired, and there are in consequence no rights to restore. This distinction between the cases where the possession is taken *under* a contract, and where there is possession with a void contract—that is, where there is no contract—rests upon principle, and is fully recognized by the authorities. (See *Barickman* v. *Kuykendall*, 6 Black. 24.)

3. The objection that the city cannot become liable for more than $50,000 over and above her outstanding or aggregate indebtedness, is founded upon the fifth section of article third of the charter, which provides as follows: " The Common Council shall not create, nor permit to accrue, any debts or liabilities which, in the aggregate with all former debts or liabilities, shall exceed the sum of $50,000 over and above the annual revenue of the city, unless the same shall be authorized by ordinance, for some specific object, which ordinance shall pro-

McCracken v. City of San Francisco.

vide ways and means, exclusive of loans, for the payment of the inter-'
est thereon, as it falls due, and also to pay and discharge the principal
within twelve years; but no such ordinance shall take effect until it
shall have been submitted to the people, and receive a majority of all
the votes cast at such election; and all money raised by authority of
such ordinance shall be applied only to the object therein mentioned, or
to the payment of the debt thereby created; provided, that the present
debt of the city, with the interest accruing thereon, shall make no part
of the $50,000 aforesaid."

This section was considered by the Board of Examiners under the
Act of 1855, providing for funding the legal and equitable debt of the
city of San Francisco, and in the report made by them the construction
which it should receive is presented with admirable clearness and pre-
cision.   *An extract of the report is embodied in the brief of counsel,
which we adopt as expressive of the views we entertain upon the
subject.

" The prohibitory words," says the report, " applied to the creation of
a debt or liability, and the permitting one to accrue, are the same.   If,
then, an act creating a debt or liability is void, and imposes no debt or
liability on the city, permitting one to accrue by failing to discharge it
when already created should, by force of the same prohibition, release
the city from any obligation to pay it.   For example: the salaries of
all the officers, whether created by the charter or by ordinances, ' are
fixed by ordinance' by the Common Council, and accrue as liabilities
against the city, from month to month, and the result would be that
after the indebtedness of the city reached a certain amount, these sal-
aries could no longer be demanded, and all offices would be vacated,
and the corporation virtually dissolved, or the officers held to have dis-
charged their duties gratuitously.   Neither of these results could have
been intended by the Legislature.

" The limit prescribed is entirely uncertain.   In the charter of the
year 1850, and in that of the present year, the restrictive clauses on
this subject contain the words ' annual estimated revenues,' and ' esti-
mated annual revenue.'   In the charter of 1851 the word ' estimated '
is omitted, and there is nowhere any provision made for a preliminary
annual estimate.   The annual revenue of the city, under that charter,
was the revenue which it received each year, and not to be known till

*This report was written by Edmund Randolph, Esq., of San Francisco.

the year had expired. Persons dealing with agents are bound by every limitation of their powers, but the limitation must be an existing one at the time of their dealing, and one within the knowledge of the persons so dealing. Assuming, then, all former liabilities to be known, there would be no existing limitation, unless this sum and the additional debts or liabilities exceeded the annual revenue by more than $50,000— a fact which not only could not be known, but would really continue entirely uncertain and contingent until the end of the year, when the productiveness of every source of revenue had been fully tested, and the revenues received.

" Under such circumstances all dealings with the city would be mere gambling, and the result would be that it would have no dealings at all, or only at the most exorbitant and ruinous rates.

" The intention of the Legislature in granting an incorporation to the city, was to create a corporation which should possess within itself the means necessary for preserving a continued existence, and on terms the least onerous to the corporators.

" But the amount of the debts and liabilities of the city at a given time, is as uncertain as the amount of revenue to be received during the year. It would depend upon a settlement of its accounts with all its creditors, involving the adjustment of set-offs, counter claims and unliquidated demands generally. The limitation, then, would be th difference between two quantities, both of which are unknown.

" And, finally, whether this amount, whatever it be, would be found to exceed the annual revenue by more than $50,000, might depend upon the judgment and good faith with which the Common Council had exercised its powers of raising an annual revenue, and applied this revenue, with all other means it might have derived from accidental sources, to the discharge of its liabilities. The agents of the city may or may not have raised all the money by taxation and licenses, etc., which they had the power to raise and ought to raise, and may or may not have applied its resources to the discharge of its debts and liabilities, and yet upon this fact may turn the question whether the person with whom they have dealt holds a valid demand against the city or not.

" Such a construction would put the creditor absolutely in the power of the debtor, and the Legislature, in constituting a city government to act as the corporate agents of the city, cannot be supposed to have intended any such change in the fundamental principles of the law, even if we should admit, which we do not, that it possesses the power to have made it.

McCracken *v.* City of San Francisco.

"For the reasons which we have given, gathered from the language of the section itself—from the general and controlling purpose of the charter taken as a whole, and construed as any other public statute, and from well settled principles of law governing the relation of principal and agent, we have come to the conclusion that the charter of 1851 contained no limitation of the power of the Common Council to incur debts and· liabilities as to the amount to be incurred, and that the fifth section of the third article is to be taken as directory. In our opinion, the Common Council, when they become satisfied that the event contemplated by the Legislature has occurred, or believe that it is likely to occur, are directed to apply to the people in the manner prescribed in this section, for authority to incur the further liability required by the wants of the city, and a failure on their part to do so would be a violation of duty, and that is the extent of the operation of this provision."

In addition to this, we are clear that the provision refers only to the acts or contracts of the city, and not to liabilities which the law may cast upon her. It was intended to restrain extravagant expenditures of the public moneys ; not to justify the detention of the property of her citizens which she may have unlawfully obtained. The plaintiff claims that the city has got his money without any consideration—by mistake —and has appropriated it to municipal purposes, and he insists that she is responsible to him for it, because the law—not her contract or permission—renders her liable. Her liability, in this respect, is independent of the restraining clauses of the charter; it arises from the obligation to do justice—to restore what belongs to others—which rests upon all persons, whether natural or artificial. And it may well be doubted whether it would be competent for the Legislature to exempt the city, any more than private individuals, from liability under circumstances of this character. Suppose, for example, that the city should recover judgment against an individual for $100,000, and collect the money upon execution, and upon appeal the judgment should be reversed ; would it be pretended that the money could not afterwards be recovered ? Could the city defend against the claim for restitution upon the pretense that she was already indebted over $50,000 ? Could she, to use the language of counsel, *owe herself out of liability?* Suppose, again, an individual should pay the taxes upon his property, in ignorance that they had already been paid by his agent, could the city retain the amount thus paid by mistake ? Could she plead her previous indebtedness as an excuse for the detention of the money to which she had no

legal or equitable right? Suppose, again, the city should neglect to keep the streets in repair, and an individual should be injured in consequence—should break his leg or be otherwise crippled—could she allege her insolvency against his claim for damages? Would her pecuniary condition be an answer for the neglect of every duty, legal and moral? If this were so, she would be the most irresponsible corporation on earth, and her treasury would be, in many instances, but a receptacle for others' property without possibility of restitution. The truth is, there is no such exemption from liability on her part. The same obligations to do justice rest upon her as rest upon individuals. She cannot appropriate to her own use the property of others, and screen herself from responsibility upon any pretense of excessive indebtedness. The law casts upon her the legal liability from the moral duty to make restitution. Admitting that the charter restricts her power to incur liabilities by her own acts—though, as already shown, its provision in this respect is merely directory—it still leaves her liable according to the general law. The restriction can, in any event, only apply to liabilities dependent for their creation upon the volition of the Common Council, and hence does not include liabilities arising from torts, or trespasses, or mistakes. (See also *White* v. *The Franklin Bank*, 22 Pick. 184; *Beach* v. *The Fulton Bank*, 7 Cow. 485.)

We have thus gone over the several positions taken by the defendant, and in none of them do we find any valid objection to the claim of the plaintiff. We have considered them at great length, from the fact that upon the decision in this case will depend, to some extent, the disposition of several other cases, which involve, in the aggregate, an amount little less than half a million. The amount received upon the sale of the slip property exceeded a million, but many of the purchasers, as we are informed, have taken deeds under the Act of the Legislature of 1858, or the amendatory Act of 1860, and have thus released their claim to reimbursement of their purchase money. Be this, however, as it may, it can have no weight in the determination of the case. It is our duty to pronounce the law, and with the consequences which follow we have nothing to do—whether they be to cast upon the city a liability of one dollar or of a million. The sale of December 26th, 1853, being void, no title passed to the purchasers at that sale. The title to the property still exists in the city, except where deeds have since been taken under the Acts of 1858 or 1860. The property remaining can at any time be taken possession or be disposed of by the city in the

same manner as any other property belonging to her, except where her right to assert her title has been barred by the Statute of Limitations; and that statute does not run in favor of parties who affirm that the title never passed from the city, and sue for the recovery of the purchase money. The plaintiff, therefore, for his money has received no consideration. The city has obtained it and used it, and she is legally, as she is morally, bound to refund it to him.

It is true, that the rejected Ordinance 481 contemplated that the first installment of the purchase money of the property should be paid to the State, pursuant to the Act of March 26th, 1851; and that the present action is brought for the amount paid by the plaintiff as the first installment of his purchase. If this amount had been paid to the State, the question of the liability of the city would have presented itself under a different aspect. It is possible, that in that case the claim for the money could only have been asserted against the State, it being paid over as it was received, under a mistaken impression of the validity of Ordinance 481. Be this as it may, it is sufficient for the determination of the present appeal, that there is no evidence before us that the money was ever paid to the State. It appears from the record, that in addition to the funds in the hands of the Land Committee appropriated to the payment of the salaries of the members and officers of the police, and in addition to the warrants and notes attached in the hands of their Secretary, upwards of $630,000 were paid by them, as the proceeds of the sale, into the city treasury, but that only $50,000 were paid over to the State, and in this amount it does not appear that the money received from the plaintiff was included. If the facts are different from those disclosed in the record before us, they can be presented for consideration upon another trial.

Judgment reversed and cause remanded.

The above opinion was written three weeks since, and passed to my associate, Mr. Justice Cope, for examination. After great consideration, he differs from the views taken in the opinion, as to the necessity of a surrender of the possession of the premises before the plaintiff can recover, and holds that such surrender must not only be made, but that the plaintiff must also procure a conveyance to the city of the property for the purchase money of which the suit is brought, before judgment can be had by him. If the plaintiff had received anything from the city, it would be only just and in accordance with the settled rules of

the law to require its restoration before he could recover.   But I am unable to perceive that he ever received anything.   There was no contract between him and the city.   There was no sale to him by the city.   The Common Council had rejected the ordinance proposed, providing for the sale.   They had declared, in effect, that the sale should not take place.   Upon the belief that the contrary was the fact; that the ordinance was passed; that the sale was ordered—the Mayor and Land Committee put up the property at public auction, and received the bid and the money of the plaintiff, and paid the money into the City Treasury; and the city used it for municipal purposes.   The Mayor executed to the plaintiff a bond for a deed, and subsequently a deed, purporting to convey the property.   The plaintiff, finding that the sale was never ordered by the Common Council, and that the acts of the Land Committee and the Mayor were unauthorized—that the bond and deed might as well have been executed, for all purposes of transferring the title, by a stranger to the city—sues to recover back his money. What has he got, then, to surrender?   He has acquired no rights.   He has received no title.   He has obtained no deed from the city; and if he has taken possession, it is not by any permission of the city.   The bond of the Mayor was not the bond of the city; and the deed executed by him was not the deed of the city.   If a stranger to the city had given them, would it be pretended, in a suit for the purchase money, that no recovery could be had until they were surrendered, or a conveyance of the premises were executed?   The stranger could invest the plaintiff with no possible right or claim to the property; but he could do so just as effectually as the Mayor, where the latter was not first clothed with the requisite authority by ordinance duly passed.

Nor is there anything, in my opinion, in the position that unless the possession be delivered, and the conveyance executed, the plaintiff or the parties receiving a quit-claim from him, will acquire such a relation to the property as to be able to resist successfully the claim to it of the city.   The plaintiff bases his right to recover upon the ground that the title never passed to him, but that it still remains in the city.   The theory upon which the action proceeds is, that the property belonged to the city, and was never sold by any authority emanating from her, and that the city has, in consequence, obtained the plaintiff's money without any consideration.   The parties receiving the quit-claim from him, took their deed about one week previous to the trial of the cause—in September, 1859—with knowledge of the pendency of the action, and of

all the circumstances of the case. The Statute of Limitations runs only in favor of parties in possession claiming title adversely to the whole world, and not in favor of those who assert the title to be in others. It therefore never run in favor of the plaintiff, and the grantees of the plaintiff are in no better position. Their possession at this day barely exceeds one year, and cannot be tacked on to that of their grantor so as to render adverse the possession for the entire period subsequent to the sale. If there are any different facts in the other cases said to be pending against the city in the District Court, awaiting the result of this, it will be time enough to pass upon their effect when· they are properly presented before us. I will suggest, however, two considerations, which will show, to some extent at léast, that the apprehensions of the defendant's counsel are groundless :

1. A large part of the property—for the purchase money of which suits are brought—has never been in the possession of the bidders at the alleged sale. It remains, and always has remained in the condition in which it existed at the day of the sale, covered with water. As soon as it was discovered that the proposed ordinance, providing for the sale, never received the requisite vote in the Board of Assistant Aldermen for its passage, suits were instituted to recover back the money paid to the city. In *Holland* v. *The City of San Francisco*, the test case, Judge Norton, of the Twelfth District, held the sale invalid, and gave judgment against the city. On appeal, this Court also held the sale invalid— Judges Murray, Heydenfeldt and Terry all concurring in the decision— but reversed the judgment of the District Court, on the ground that as the Land Committee and Mayor had no authority to make the sale, they had no authority to pay the money over to the city—in other words, on the ground that there was no privity between the purchasers and the city. If this decision had stood, the purchasers would have lost both the property and their money, whilst the city would have retained both. This was so manifestly unjust that a rehearing was granted, and the alleged want of privity was considered so untenable that it was abandoned by counsel on the reargument. In the meantime, the Bench had been changed—Mr. Justice Heydenfeldt having resigned, and Mr. Justice Burnett having been appointed in his place. After the reargument, the sale was held valid by Judges Burnett and Terry—Chief Justice Murray dissenting—not on the ground that the proposed ordinance, providing for the sale, was ever passed, but on the ground that it had been referred to in a subsequent ordinance, appropriating certain proceeds of

the sale, and that this reference and appropriation recognized and adopted the previous ordinance—in other words, recalled the rejection and gave validity to the ordinance, thus rendering the sales binding upon all parties.   This decision never met the approbation of the profession and practical business men—who read in the charter, that for a sale of city property, an ordinance duly passed by a majority of the members of both Boards of Aldermen was required, and that an ordinance could only be passed in one way—by the Common Council voting for it—could not understand how a rejected ordinance could be called into life and efficacy by a reference to it as having passed, or by an admission that it had passed ; and they have been unwilling, in consequence, to trust to the sufficiency of the title resting upon this basis. The natural result has followed—the property has remained to a great extent unimproved, covered with water, and, of course, in the adverse possession of no one.

2.  To render possession adverse, so as to set the Statute of Limitations in motion, it must be accompanied with a claim of title; and this claim, when founded " upon a written instrument as being a conveyance of the premises," must be asserted by the occupant in good faith, in the belief that he has good right to the premises, and with the intention 'to hold them against all the world.   The claim must be absolute—not dependent upon any contingencies—and must be " exclusive of any other right ; " and to render the adverse possession thus commenced effectual as a bar to a recovery by the true owner, the possession must be continued without interruption, under such claim, for five years. When parties assert, either by declarations or conduct, the title to property to be in others, the statute cannot, of course, run in their favor.   Their possession, under such circumstances, is not adverse.   It would seem impossible, therefore, for the parties who have sued for the purchase money—basing their right to recover upon the ground that the title to the property never passed to them, but that it still remains in the city, and that the proceedings of the Mayor and Land Committee were unauthorized acts—to set up an adverse possession against the city. No recovery can be had, in any of the suits pending, without facts of the character designated being established, and the attempted proof of them, and the asking for judgment in consequence, are declarations as expressive as any which can well be imagined against any possible claim by adverse possession.

I make these suggestions only in answer to the position of counsel,

McCracken *v.* City of San Francisco.

and not because I regard them as at all necessary to the disposition of the case.   I think they meet, also, to some extent, the objections arising from the supposed possible consequences in other cases, if a surrender of the possession and a conveyance of the premises be not required as a condition of a recovery of the purchase money.   With such possible consequences the Court has really nothing to do in determining the questions in the case at bar.   It is plain that the plaintiff in the present case never held adversely, and that if the statute has run at all in favor of his grantees, it has done so for a period barely exceeding a single year.

The disagreement between Mr. Justice Cope and myself existing, no judgment can be rendered in the present case, unless the plaintiff elect to accept the condition imposed by him.   I cannot assent to a judgment imposing the condition without such election, as I do not regard it as required by the law.   He cannot assent to the omission of the condition, viewing it as essential to the recovery.   The plaintiff must, therefore, take a judgment in the form indicated by him, reversing the judgment of the Court below, and remanding the cause for a new trial, and directing the Court below to dismiss the action, if at the trial proof be not given of a conveyance and surrender of the premises to the city, and pay the costs of the appeal, or the case must remain undetermined until there is a change on the Bench.   The plaintiff can have twenty days to make his election.

COPE, J.—I concur in the judgment of reversal, but as I differ with the Chief Justice upon certain points in the case, it is proper that I should state the reasons which control my opinion upon these points. The plaintiff relies for a recovery upon the invalidity of the contract under which the money in controversy was paid.   It is claimed that the contract was void for want of authority in the persons professing to represent the city, and that the money was paid under a misapprehension upon this subject, and without consideration.   There is no doubt of the invalidity of the contract; but it appears that, upon the payment of the money, a deed was executed in the name of the city, and that the plaintiff took possession of the property intended to be conveyed. If this deed is available as against the city for any purpose, or if injury or inconvenience is likely to result from it, before the plaintiff can recover, the property must be reconveyed and the possession surrendered.   A recovery upon any other terms would be so unjust and

inequitable that it cannot, of course, be allowed. In actions of this nature, relief is administered upon equitable principles, and a party asking the assistance of the Courts in such cases must do whatever equity and justice may require. "The action for money had and received," says the Supreme Court of New York, "is an equitable action, and will lie whenever the defendant has received money belonging to the plaintiff, which, according to natural equity and justice, he ought to refund or pay over. It should not be extended, however, to cases in which the defendant may be deprived of any right, or subjected to any *inconvenience* thereby." (*Rathborn* v. *Stocking*, 2 Barb. 135.) "It is a universal rule," says the same Court, "that where a party seeks to recover back money paid upon a contract, on the ground that it is void for fraud, or that it has been rescinded, such party must restore or offer to restore whatever he has received under the contract, so as to put the other contracting party in *statu quo.* * * * Whatever may be valuable to the defendant must be restored to him, though it be of no value to the plaintiff." (*Moyer* v. *Shoemaker*, 5 Barb. 319.) In *Cope* v. *Williams*, (4 Ala. 262) it was declared by the Supreme Court of Alabama that a party in possession of land under a void contract of purchase must surrender the possession before he can maintain an action for the recovery of the purchase money. In Indiana, this point has been differently determined; but it is certain that where the contract is not absolutely void, money paid under it cannot be recovered back without a surrender of the possession; and if a deed has been executed, there must also be a reconveyance.

The law upon this subject is perfectly well settled, and there can be no doubt that if the effect of a recovery in this case will not be to put the parties in *statu quo*, the action must fail. The deed to the plaintiff is signed by the Mayor and sealed with the corporate seal of the city. It is admitted that the Mayor was the legal custodian of the seal, and that it was affixed by him, or under his authority. This is sufficient to entitle the deed to be read in evidence, and a party relying upon it need not go behind the seal for the purpose of showing the authority for its execution. It derives its character from the seal, and the seal itself is *prima facie* evidence of all the authority necessary to render it a valid and sufficient conveyance of the property.

"Where the common seal of a corporation," say Angell & Ames, "appears to be affixed to an instrument, and the signatures of the proper officers are proved, Courts are to presume that the officers did not

exceed their authority; and the seal itself is *prima facie* evidence that it was affixed by proper authority. The contrary must be shown by the objecting party." (Ang. & Ames on Corp. sec. 224.) This doctrine is fully supported by the authorities referred to for that purpose. "It is sufficient to observe," says the Supreme Court of Tennessee, "that the seal of a corporation to an instrument constitutes *prima facie* evidence that it was planted there by the proper authority, and that the instrument is the act of the corporation. (*Levering* v. *The Mayor, etc., of Memphis,* 7 Humph. 553.) "The mere proof of the seal," says the Supreme Court of Pennsylvania, "is at least *prima facie* evidence that it was duly affixed; and, in the absence of evidence to the contrary, dispenses with the necessity of positive proof. * * * The seal itself is *prima facie* evidence that the contract was duly entered into by the corporation." (*The President, etc., of the Berks and Dauphine Turnpike Road* v. *Myers,* 6 Serg. & Rawle, 12.) "The appearance," says the Court of Chancery of New Jersey, " of the common seal of a corporation to an instrument, is evidence that it was affixed by proper authority. * * * But while the common seal is held to be evidence of the assent and act of the corporation, it is not conclusive. It may, nevertheless, be shown that it was fixed without proper authority. The matter is susceptible of investigation. The burden of proof is thrown upon the objecting party, and he will be required to produce such evidence as shall be clear and satisfactory." (*Leggett* v. *New Jersey Manufacturing and Banking Company,* 1 Sax. Ch. R. 541.) To the same effect is the language of the Court of Chancery of New York in *Lovett* v. *Steam Saw Mill Association* (6 Paige, 54). "It lies," says the Court, "with the party objecting to the due execution of the deed to show that the corporate seal was affixed to it surreptitiously or improperly, and that all the preliminary steps to authorize the officer having the legal custody of the seal to affix it to the deed had not been complied with." The same opinion is expressed by the Supreme Judicial Court of Massachusetts, in *Burrill* v. *Nahant Bank* (2 Met. 163). "The deed," says the Court, "duly executed under the corporate seal of the bank, and produced by the party claiming under it, is *prima facie* a good title, and it is for those who wish to set it aside to impeach it."

It is unnecessary to multiply authorities upon this subject. I have looked carefully through the cases, and find that the weight of authority is overwhelmingly in favor of this doctrine. *Miller* v. *Ewer* (27

Maine, 509) and *Johnson* v. *Bush* (3 Barb. Ch. R. 207) may perhaps be regarded as opposing authorities; but the latter is not so considered.

It is impossible to doubt that the deed in this case is sufficient *prima facie* to pass the title. The money sued for is a part of the consideration which was paid for the property embraced in this deed, and the plaintiff, after taking possession of the property, conveyed it to a person who is still in possession, holding adversely to the city. Under these circumstances, it would be unjust to permit the plaintiff to recover without procuring a reconveyance of the property and a surrender of the possession. The proposition that this deed is a mere nullity cannot be maintained. I admit that, for the purpose of passing the title, or creating directly any right or interest as against the city, it is, in fact, inoperative and void. I admit, also, that it may be attacked collaterally, and its invalidity shown in any proceeding in which it is attempted to be used. The objections to it do not, however, appear upon its face, and I am unable to see upon what principle it can be regarded as an absolute nullity. Its invalidity must be shown by the party impeaching it, and evidence *aliunde* must necessarily be resorted to for that purpose. *Prima facie* it is a valid and sufficient conveyance, and it is such a cloud upon the title that equity would, upon a proper application, set it aside. It is sufficient to support an adverse possession, and a party holding under it must be deemed to hold adversely, and not in subordination and subjection to the real title. It can hardly be said that such a deed, however ineffectual for the purpose for which it was intended, is an entire nullity. Possession under it may ripen into a perfect title, and it cannot fail to prejudice the interests, if not the rights, of the lawful owner. In such cases, the law requires that the parties shall be placed in *statu quo*, and the Courts proceed upon the broadest principles of equity and justice. I see no escape from the conclusion, that before the plaintiff can recover, the property must be reconveyed, and the possession surrendered.

I think, however, that this judgment should not be affirmed. The effect would be to bar the plaintiff's claim, and leave the title to the property still in the city. This would be as unjust as it would be to allow the plaintiff to recover without a surrender of the property. Upon a retrial of the cause, the plaintiff should be permitted to show that he had procured a reconveyance of the property and a surrender of the possession. This I deem to be the equity and justice of the case, and I therefore concur in the reversal of the judgment. I do so,

McCracken v. City of San Francisco.

however, upon condition that the plaintiff pay the costs of this appeal, and that the Court below be directed to dismiss the action, unless proof be made at the trial of such reconveyance and surrender.

The plaintiff elected to take judgment in the form indicated by Justice COPE.